Filed 3/16/15  In re Logan C. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re LOGAN C., a Person Coming Under the Juvenile Court Law. | D066433 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518-551) |
| v. | |
| IGNACIO C., et al. | |
| Defendants and Appellants. | |

APPEALS from judgment and order of the Superior Court of San Diego County,

Laura J. Birkmeyer, Judge.  Affirmed.

Lelah S. Fisher for Defendant and Appellant Ignacio C.

Rosemary Bishop for Defendant and Appellant Sandra C.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Brittany Murphy for Minor.

Appellants Sandra C. (Mother) and Ignacio C. (Father) appeal a juvenile court judgment terminating their parental rights to the minor, Logan C., and choosing adoption as the appropriate permanent plan. (Welf. & Inst. Code, § 366.26; all further statutory references are to this code unless noted.) They also appeal the court's denial of Mother's related modification motion for return of Logan to her care. (§ 388.)

Logan came to the attention of respondent San Diego County Health and Human Services Agency (the Agency) in October 2012, when he was 10 months old and riding in the car in which Mother was arrested for transporting methamphetamine and heroin, after she and her sister visited Father in state prison. The Agency filed a dependency petition under section 300, subdivision (g), alleging the parents were incarcerated and unable to arrange appropriate and adequate care for Logan, and he was detained in care and then with a relative. The petition was amended to add a count under section 300, subdivision (b), alleging that Mother left Logan unattended and inadequately supervised upon her arrest. Reunification services were provided for 12 months.

Previously, this court denied Mother's petition for writ review (joined by Father) of the juvenile court's order terminating reunification services as to both parents at the 12-month stage of the proceedings, and setting a hearing under section 366.26. (*Sandra C. v. Superior Court* (June 11, 2014, D065494) [nonpub. opn.]; our prior opn.) The juvenile court proceeded to hear the section 366.26 petition, terminating parental rights and denying Mother's concurrent motion for modification under section 388.

Mother, joined by Father, first argues the court abused its discretion when it denied her motion for modification, based upon her showing of changed circumstances.

2

(§ 388.)[1]  They then challenge the sufficiency of the evidence to support the court's finding that no exception to adoption preference (i.e., the beneficial parent-child relationship, § 366.26, subd. (c)(1)(B)(i)) applies here.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)  We affirm the judgment and order.

I

*BACKGROUND*

A.  Jurisdiction, Disposition, and Termination of Reunification Services

We take some of the background facts occurring before the 12-month hearing date, as they were set forth and reviewed in our prior opinion.  In October 2012, Mother was arrested after being stopped at a check point when she was returning from the state prison where Father was incarcerated.  Her 18-year-old sister A. and 10-month-old Logan were with her in the car.  Because Mother was not allowed on prison grounds, due to her probation status for previously attempting to smuggle heroin into jail, the plan had been that A. would smuggle drugs into the prison and pass them to Father, while he visited with Logan.  However, the drugs remained in the car when A. decided not to go through with the plan.

When Mother's home was searched after her arrest, police found drug paraphernalia and marijuana in the room where she and Logan slept.  A San Diego Sheriff's Department deputy informed the Agency that Father was a gang member from

[1]  Father's counsel filed letters joining in each of Mother's briefs on appeal (except for one portion of her statement of facts referring to certain criminal charges brought against him in October 2013, attempted murder, possession of drugs and firearms). Logan's counsel filed a letter joining in the Agency's respondent's brief.

3

Logan Heights and a member of the Mexican Mafia, who had a significant criminal history and possessed a lot of power in prison and on the streets.

After the Agency filed the petition under section 300, subdivision (g), it added allegations that Mother left Logan unattended and inadequately supervised due to her arrest in October for transporting drugs when he was present. (§ 300, subd. (b).) Mother admitted she was transporting the drugs at Father's direction and had done so before, leading to her conviction and probation for trying to smuggle drugs to him. After a short delay, Logan was detained in the home of Mother's cousin L.M. (the caregiver), and her fiancé. A jurisdiction and disposition hearing on December 27, 2012 resulted in the sustaining of the amended petition, with orders for reunification services for both parents, and continued placement of Logan with the caregiver.

By late April 2013, both Mother and Father had been released from custody. While incarcerated, Mother attended a parenting class, Narcotics Anonymous (NA) meetings, and an anger management class. She also received a food handler's certificate and completed drug education classes. Following her release, Mother attended a substance abuse program called ParentCare, in addition to NA meetings and other services. Her attendance was spotty and she did not complete the program's required assignments. She underwent a number of random drug tests with negative results, although she tested positive for tetrahydrocannabinol (THC) once in June 2013.

Mother consistently visited with Logan while she was in jail and on work furlough, and she had supervised visits with him after her release. Both of them enjoyed the visits. Mother was living with her aunt, and her own mother lived there as well.

4

Mother had a dependency background as a child because her mother was a long time substance abuser.

At the contested six-month review hearing, the court found Mother had made some progress with her case plan, although Father had not. The court continued reunification services for both parents.

In Mother's updated case plan, she was expected to address in group therapy her understanding of what brought this case to the court's attention and to describe in detail the risk of harm from trafficking drugs in the presence of Logan. She was directed to write a letter explaining how selling drugs from her home could harm Logan "and exactly how things would be different in the future so this does not happen again." Both parents were ordered to participate in dependency drug court.

Father was again briefly incarcerated in August 2013, because his parole officer found illegal drugs in his home. While out of jail, Father did not participate in reunification services and he had tested positive for drugs three times. By August 2013, Mother was pregnant with his second child, and was considering separating from Father. He was returned to custody October 24, 2013, when he was arrested for attempted murder, after allegedly shooting and wounding a San Diego police officer who was trying to arrest him on two felony warrants. Charges of drug, weapons and burglary equipment possession by a parolee were also filed against him.

By the fall of 2013, the Agency's reports recommended that the court terminate reunification services for both parents and proceed to a section 366.26 hearing. The 12-month review hearing was continued until February 2014. As of October 2013,

Mother had decided not to separate from Father and she visited him in jail as much as she could. She appeared depressed and had symptoms of PTSD due to her separation from Logan. She was concerned about how she would handle both caring for her new baby and successfully reunifying with Logan. She started individual therapy and her therapist reported that at times, Mother heard voices, and she might have depression with psychotic features. The therapist thought Mother needed medication for depression, but Mother refused to take medication because she was due to deliver her new baby in April 2014. The therapist recommended she undergo a psychiatric and psychological evaluation.

In the court-ordered psychological evaluation in November 2013, Mother told the evaluator she had trafficked in narcotics when Logan was small, because "I had a new baby, my husband was in prison, I couldn't make the bills, it was a quick way to make a lot of money." She told the evaluator she had used marijuana daily between the ages of 12 and 19, but had been abstinent since her arrest in October 2012. Mother met the criteria for major depressive disorder and was debilitated by her emotional symptoms. The evaluator concluded that Mother did not appear to have any cognitive or intellectual impairment that would prevent her from benefitting from services, but it was unlikely she would meet expected goals by the end of 2013, due to her impaired emotional and psychological functioning (severe depression exacerbated by symptoms of pregnancy).

A February 2014 Agency addendum report stated that Mother's therapist expected that Mother would stop being involved with Father if the Agency told her she could not be with him. The social worker explained, "the Agency could not tell [Mother] who [she

6

could] be in a relationship with, but that is something she would have to decide herself with the help of her services, including individual therapy."  Mother explained she continued her relationship with Father because "he is still a person and he just made a bad mistake."  She continued to visit him and said he was supportive of her and that they were in the process of planning a name for their new baby.

Mother changed outpatient programs, since the first one did not work out well for her, and she started attending Family Harmony West Women's Recovery Center (Harmony West).  Mother's case manager at Harmony West told the social worker that Mother was sometimes engaged in sessions and sometimes "just sits there . . . and has a flat affect . . . ."

At the continued 12-month review hearing in February 2014, the court admitted all of the Agency's reports and an update letter from Harmony West into evidence.  The court took testimony from the social worker and from Mother and her therapist.  The court found the Agency had provided each parent with reasonable services.  The court further found return of Logan to parental custody would create a substantial risk of detriment to him, and there was no substantial probability of such a return to parental custody by the 18-month date (in April 2014).  Accordingly, the court terminated reunification services and set a section 366.26 selection and implementation hearing.  In our prior opinion, Mother's petition for writ review of those orders was denied.

B.  Modification Motion and Permanency Planning Hearing

Mother continued to attend therapy after her reunification services were terminated.  In April 2014, her new baby with Father was born (daughter Luna), and

7

Mother graduated from drug dependency court in July 2014. The updated case plan allowed Mother's continued supervised visitation with Logan, but Father's visits were terminated because it distressed Logan too much to go to the jail.

In July 2014, Mother brought a motion under section 388 for return of Logan to her care, on the grounds that she had made material changes in improving her situation. Mother had resolved her drug issues and her symptoms of depression and PTSD were reduced, and she was able safely to care for her new baby. The Agency opposed the modification request.

The court ruled that Mother had made out a prima facie case for modification, and it combined the hearing on that request with the hearing on adoption of a permanent plan, held in July and August 2014. We will defer further outlining the facts on modification and the permanency planning issues until the discussion portion of this opinion. On a procedural note, the Agency's preplanning and assessment unit determined that Logan was adoptable, and that the current caregivers were interested in adopting him.

At the joint hearing on the motion and the petition, the court considered testimony from Mother's therapist and the assessment social worker. The court heard arguments of counsel, and read and considered the evidence contained in the motion and the Agency reports and exhibits. Modification was denied, and the court heard argument on the permanency planning issues. The court found Logan was adoptable and that none of the exceptions to adoption found in section 366.26, subdivision (c)(1)(B) applied (no parent

or sibling bond [Luna]).[2]  Adoption was found to be in Logan's best interests, the parental rights were terminated, and adoption was chosen as his permanent plan.  These appeals followed.

II

*MODIFICATION MOTION*

A.  Introduction

Mother, joined by Father, argues the juvenile court erred or abused its discretion by denying her section 388 motion seeking placement of Logan with her.  In seeking modification, she referenced the orders from November 2012 that removed Logan from her care (postdetention; dispositional orders made in December 2012).  Mother did not expressly attack the 12-month review order from February 2014 that maintained Logan's placement with the caregiver, nor did she seek to have reunification services reinstated.

After this appellate briefing was completed, the Agency filed a letter of errata, seeking to "clarify" its view that the parents had forfeited any modification arguments by failing to earlier challenge the December 2012 dispositional orders.  We allowed supplemental briefing.  Even assuming the section 388 motion seeking return to Mother's care could have addressed other orders, we decline to find that any forfeiture of appellate arguments occurred.  The juvenile court's hearing on the modification and termination

---

[2]     Although the juvenile court ruled that the sibling exception to termination of parental rights did not apply, due to the lack of common experiences between Logan and Luna, Mother and Father do not make any such arguments about Luna on appeal.  Father merely joins in the arguments made by Mother, and points out that if the judgment were to be reversed as to her, it should be reversed as to him as well.  (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1263.)  As we will show, that is not a problematic issue here.

issues was comprehensive, and Mother's modification arguments appropriately requested the trial court to consider the changes of circumstance she was claiming. On appeal, the modification issues are adequately presented on their merits.

B. Applicable Standards: Two Prongs

A petitioner requesting modification has the burden of proof to show a change of circumstances or new evidence, and that the proposed modification is in the child's best interests. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47; § 388, subd. (a)(1).) The focus of a modification hearing is whether the petitioner has shown a significant change of circumstances. (*Ibid.*) In deciding whether the petition makes the necessary showing, the juvenile court may consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) The court held a full hearing on modification, after Mother made a prima facie showing. (*In re Marilyn H.* (1993) 5 Ca1.4th 295, 310.)

We review the grant or denial of a petition for modification under section 388 for abuse of discretion. (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71; *In re Casey D., supra,* 70 Cal.App.4th at p. 47.) Although the abuse of discretion standard gives the trial court substantial latitude, " '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." ' " (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119, citing *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.) We will not disturb a discretionary decision unless the lower court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*In re Stephanie M.*

10

(1994) 7 Ca1.4th 295, 318; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.) The complaining party must affirmatively establish abuse of discretion; it is never presumed. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423.)

It is not our role to reweigh the evidence. "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence." (*In re Casey D., supra,* 70 Cal.App.4th at pp. 52-53.)

### C. Evidence at Hearing

In Mother's modification petition under section 388, she presented evidence that since her reunification services were terminated in February 2014, she continued to participate and to progress in individual therapy. Her new baby, Luna, was born in April 2014 and she was successfully caring for her. Her feelings of depression had improved, and she had consulted her OB/GYN on that subject, and was monitoring the situation with a checklist. Mother's regular weekly supervised visits with Logan were maintaining the parental bond, and Logan was getting to know the baby. Mother was distancing herself from Father, as she had told a police investigator looking into the charges against him in October 2013.

The Agency filed an addendum report in opposition to the section 388 petition.

At the hearing, the court heard testimony from Mother's therapist Estela Bobadilla, who noted that Mother called on her as needed for support. Mother demonstrated

11

understanding that untreated depression would affect her children negatively. The therapist noted that in July 2014, Mother graduated from drug court (278 days clean and sober).

The therapist believed that Mother had worked on her "power and control" issues related to Father, and that Mother did not show any symptoms of codependency. Mother believed she could avoid influence from Father and would be able to avoid situations which could cause removal of her children. The therapist had discussed the issues that Mother had with Father during only about 10 percent of their time in sessions. She understood that Mother continued to visit him in jail, and that Mother would have divorced Father if the Agency told her to do so.

The court heard testimony from the social worker that the Agency's investigation had not found any safety threats if Mother retained custody of her new baby. In the opinion of the social worker, the benefits of adoption for Logan would outweigh any benefits of maintaining his bonds with Mother or Father. The Agency noted that Mother's participation in the drug treatment program was rated at "fair," and that it was unclear how Mother was actually demonstrating progress in therapy.

For example, Mother was prioritizing her relationship with Father, by visiting him in jail once or twice daily around the time that Luna was born in April 2014, and throughout the next few months. Mother told the social worker that she and Father just took their relationship day by day.

The social worker's observations of weekly visits between Mother and Logan led her to conclude that it was a comfortable but not a significant relationship. Logan called

Mother by her first name, while he referred to his caregiver and her fiancé as Mama and Papa. At the end of a May 2014 visit, Logan said, "No go" when Mother explained to him it was time to go home, but then he kept playing and eventually left, waving goodbye to her while his back was turned.

The trial court denied Mother's section 388 petition. The court observed that she had made progress in dealing with her depression and in being able to take care of her new baby, but Mother continued to identify Father as one of her support people, and there was no showing that Mother had developed insights into what she would do if Father remained in custody and requested her assistance, such as breaking the rules. It appeared to the court that Mother did not want to address those issues.

With regard to the strength of the bond between Logan and his parents, or Logan and the caregiver, the court ruled that changing the placement back to Mother would not be in the best interests of Logan, according to the weight of the evidence. Logan had been through trauma through his separation from Mother, and in visiting Father in jail, and the caregivers had worked hard to address the behavioral byproducts, with success. Logan was cooperative with Mother but did not look to her for his needs.

### D. Analysis on Changed Circumstances and Best Interests

On appeal, Mother initially contends that the juvenile court abused its discretion in ruling that no material changes in her circumstances had been demonstrated, especially after the time of the 12-month review hearing. Mother essentially argues that the critical issues were her ability to safely parent an infant, to regularly visit Logan, and to show mental health improvement, and they should have been given greater weight. She claims

13

the court downgraded those efforts and erroneously faulted her for not completing all the written and oral assignments for her intensive drug program, and for continuing her regular visits to Father in jail. Mother argues she had only minor deficiencies in meeting the Agency's expectations.

In her case plan, Mother was required to participate in weekly therapy to address self-esteem issues and her poor decisionmaking that had placed Logan at risk at the time of her arrest. After her services were terminated, Mother continued to discuss with her therapist how to achieve empathy with her children and place their needs before her own. She was then able to progress beyond resolving her depression and parenting issues to reach the issues about her relationship with Father, such as power and control. Mother understood that Father would be incarcerated for a lengthy period of time and she would have to support her children without him. By June 2014, her therapist felt that she would be able to avoid Father's influence.

Mother also points to the evidence that her previous use of marijuana had been a coping mechanism for her depression, and she now understood how to use other coping mechanisms and had remained drug free. Even though she had substantially complied with her drug recovery services, she did not complete their reporting requirements, but under her particular circumstances, that was not a material parenting issue. Further, Mother had obtained housing with her aunt and thus she now had a greater support system, beyond Father, should her depression return. From this evidence, Mother argues that changed circumstances were demonstrated.

14

Mother correctly states that the mere diagnosis of a parent's mental illness does not constitute detriment to a child in his or her custody. (See *In re James R.* (2009) 176 Cal.App.4th 129, 136.) The trial court commended Mother for her efforts in addressing her depression issues, particularly after her reunification services were terminated, and her depression issues evidently did not play a large role in the court's reasoning. Even so, by the time that the juvenile court decides that a parent's reunification services should be terminated, the dependency focus has shifted from reunification toward how best to promote the circumstances of permanency and stability for the child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) Mother was required to establish how her requested modification would advance Logan's need for permanency and stability. (*Ibid.*)

Although her evidence shows that Mother may be changing, in light of the entire record, we are not persuaded that Mother showed sufficiently changed circumstances on the essential issues that brought Logan into the dependency system. The trial court had an ample basis in the record to have ongoing serious concerns about the intertwined issues of Mother's relationship with Father, and her tenuous stability as a parental figure for Logan. The court noted at the hearing that it remained unclear why, in therapy, Mother had not more completely discussed her problems with Father in the context of her parenting issues, except that it appeared she did not wish to address those issues and any risk that they continued to pose to Logan.

In deciding whether ordering placement of Logan with Mother was in his best interests, the court specifically addressed the modification factors set out in *In re*

*Kimberly F.* (1997) 56 Cal.App.4th 519.  These include (1) the seriousness of the problem leading to the dependency; (2) the relative strength of the child's bonds with the parent and with the caretaker; (3) the degree to which the problem could be easily resolved.[3]  (*Id.* at p. 532.)

The court evaluated the seriousness of the problem leading to dependency as high, because of Logan's exposure to the potentially dangerous situations of arrest and drug violence.  Mother came to understand how the serious offenses of drug use and trafficking posed risks to her children, and argues that since she too had suffered from her poor choices, she presumably was unlikely to reoffend.  However, Mother's choices to transport drugs more than once showed some pattern or willingness to accommodate Father's wishes above her own, and it remained unclear in the record whether she had broken free from that influence, to the degree necessary to minimize risk to Logan.

The second factor in the modification decision is the strength of the relative bonding between Logan and Mother, and Logan and his caretakers.  (*In re Kimberly F., supra,* 56 Cal.App.4th 519, 532.)  Mother points out that she maintained her relationship with him through weekly visitation, cared for him during visits, and showed knowledge of his age appropriate behavior.  However, the Agency's social worker had reason to characterize Mother as a friendly visitor to Logan, not dominantly a parental figure, as

_____

[3]      Mother points to recent legislation to suggest that as of April 2015, she (a person with a felony drug conviction), may be eligible for additional government financial support, restored welfare and food stamps (CalWORKS and CalFresh) benefits.  She asks that we take judicial notice of this change pursuant to Evidence Code section 452, subdivision (c).  It is not necessary to do so to resolve the issues presented on appeal.

16

shown in the visitation observations. The court noted that Logan was doing well in the caregivers' home, although he had previously suffered from trauma and separation anxiety. Moving him back to Mother's care would likely undermine his stability and was probably not going to help him, in light of the significant and related issues that Mother still needed to address concerning the impact Father has upon her life and those of her children.

The third factor from *In re Kimberly F.*, *supra*, 56 Cal.App.4th 519, 532 addresses the relative ease with which dependency issues can be resolved. Although Mother had made significant progress in understanding when it was important to put the interests of her children above her own, her insights gained through therapy suggested that the family problems were not over and could possibly resurface. We are not authorized to reweigh the evidence. The trial court resolved conflicts in the evidence and concluded that reasonable inferences should be drawn that the required changed circumstances had not been demonstrated, to enable the court to grant the motion as promoting Logan's best interests. (See *In re Casey D., supra,* 70 Cal.App.4th at pp. 52-53.) It was not an abuse of discretion to find that a preponderance of the evidence did not support the granting of the modification motion.

III

*TERMINATION OF PARENTAL RIGHTS*

A. Introduction; Applicable Standards

When the court determines a dependent child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the

17

child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re C.F.* (2011) 193 Cal.App.4th 549, 553; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) As relevant here, the adoption preference will not apply if termination of parental rights would be detrimental to the child because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

On review, the appellants bear the burden of demonstrating a lack of substantial evidence to support the trial court's findings and orders. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) In reviewing the sufficiency of evidence, the reviewing court makes presumptions in favor of the order, views the evidence in the light most favorable to the prevailing party, and gives the order the benefit of every reasonable inference. (*In re C.F., supra*, 193 Cal.App.4th 549, 553; *Autumn H., supra,* 27 Cal.App.4th 567, 576.)

The Agency seems to argue for an adapted or hybrid approach for review of such a decision about the beneficial parental relationship exception. In *In re J.C., supra,* 226 Cal.App.4th 503, the court applied the substantial evidence standard of review to the factual issues of whether the parent had maintained regular visitation and contact with the child and whether the parent proved an existing beneficial parental relationship with the child. However, as to the weighing test, in which the juvenile court balances the parent-child relationship against the benefits the child would derive from adoption, the abuse of discretion test should be applied to evaluate a " ' " 'quintessentially discretionary decision.' " ' " (*Id*. at p. 531; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

18

Certainly, there is a discretionary component to the trial court's determination of a "benefit from continuing the relationship" under the terms of section 366.26, subdivision (c)(1)(B)(i). Based on the respective showings, the court must balance "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) The court must find "a compelling reason for determining that termination would be detrimental to the child," (§ 366.26, subd. (c)(1)(B)(i)), due to the parent's regular visitation and contact with the child, coupled with benefit to the child from continuing the relationship. (*In re C.F., supra*, 193 Cal.App.4th 549, 553.)

The weight of authority still applies the substantial evidence test to appeals from decisions about the beneficial parental relationship exception. (*Autumn H., supra*, 27 Cal.App.4th 567, 575-577.) In doing so, the appellate court does not redetermine the credibility of witnesses or reweigh the evidence presented. (*In re L.Y.L., supra,* 101 Cal.App.4th at p. 947.)

### B. Second Prong Criteria and Analysis

The juvenile court appropriately noted that Mother had satisfied the first prong or requirement under section 366.26, subd. (c)(1)(B)(i)), that a parent continue regular visitation and contact with the child, and we accept that finding here. As to Father, the court deemed that he had sufficiently attempted to participate in supervised visitation at jail, even though it had been terminated because of its very upsetting effect on Logan. It is also not disputed that Logan is likely to be adopted, despite his minor speech delays related to learning two languages. The caregivers were interested in adopting him, but if

they were unable to do so, there were 116 approved San Diego County families interested in adopting a child with Logan's characteristics.

We accordingly evaluate the record for evidence on the court's finding that there would be no substantial, overriding benefit gained by Logan if his child-parent relationship with Mother were to be continued. (*Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.) Father makes no such personal claim, only joining in Mother's. The evidence received by the juvenile court on Mother's section 388 petition was also considered with the section 366.26 issues.

As described in *Autumn H.,* the beneficial relationship exception must be examined on a case-by-case basis, taking into account the many variables that can affect the parent-child relationship. (*Autumn H., supra,* 27 Cal.App.4th. at pp. 575-576; *In re J.C., supra*, 226 Cal.App.4th 503, 532.) Among the variables to be considered in evaluating the benefits in a parental relationship are the child's age, the amount of time the child spent in the parent's care, whether the interactions are positive or negative, and whether the child has particular needs that the parent can satisfy. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467.)

At the permanency stage, the bond the child shares with the parent and the harm that might arise from terminating parental rights must be balanced against what is to be gained in a permanent stable home, and "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) We look to whether severing Mother's relationship with her natural child would harmfully deprive

20

the child of a substantial, positive emotional attachment.  (*In re J.C., supra*, 226 Cal.App.4th at pp. 528-529; see *In re C.F.*, *supra*, 193 Cal.App.4th 549, 553-554.)

Even without day-to-day contact and interaction, a parental relationship may be so "strong and beneficial" that "termination of parental rights would be detrimental to the child."  (*In re C.F., supra*, 193 Cal.App.4th 549, 555, fn. 5.)  More than "some measure of benefit" must be conferred through the relationship with the parent.  (*Id.* at pp. 558-559.)  " 'Interaction between [a] natural parent and child will always confer some incidental benefit to the child.' "  (*Id.* at p. 555.)  The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent.  (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

These proceedings addressed the issue of substantial or incidental benefit from this parent-child relationship in several ways.  Logan was less than a year old when these issues were brought before the court, and there were continuing concerns about Mother's likelihood to comply with Father's wishes and perceived needs over Logan's needs.  Coping with Father and their new baby were significant remaining challenges in Mother's life, and the Agency's assessment report stated that Mother wavered back and forth on whether she wants to continue her relationship with Father.  Mother sometimes gave conflicting accounts of the extent of her visitation with Father, and 90 percent of her time in therapy did not include discussing her problems with Father with the counselor.

With respect to the emotional attachment between Mother and son, the author of the Agency's assessment report, social worker King, observed five visits in mid-2014, and observed that they laughed and had a good time, and Logan asked Mother for help

21

when necessary. Although Logan had suffered from separation anxiety when he first left Mother's care, he no longer had a problem separating from her. After visits, Logan looked forward to going home to his caregivers, calling them Mama and Papa, and was not upset to leave Mother (calling her "Sandy") behind. The social worker described Mother as appearing to be a friendly visitor with Logan. The evidence showed that Mother and Logan had comfortable and familial-style interactions, but that the relationship had not progressed beyond friendly, supervised visitation. This was significant evidence that Mother's interactions with Logan had not created an overriding strong parental bond, and that he would not be caused emotional harm if they no longer regularly occurred. (*In re Angel B.*, *supra*, 97 Cal.App.4th 454, 468.) Likewise, Logan was not observed to relate to Father as a parental figure.

The trial court had the responsibility of analyzing the evidence about all the circumstances in Logan's life, and had an adequate basis to conclude that he did not have any special needs that Mother especially would satisfy. To the extent Mother relies on *In re S.B.* (2008) 164 Cal.App.4th 289, she cannot show the required similarities. In *S.B.*, this court stated that the beneficial relationship exception does not require that a parent establish that a child's primary attachment was to him or her. (*Id*. at p. 299.) Since we issued our opinion in *S.B.*, we have published other cases that seek to discourage any improper and inaccurate reliance upon that opinion. (See *In re Jason J.* (2009) 175 Cal.App.4th 922, 937.) We have expressly limited the holding of *S.B.*: "[W]e once again emphasize that *S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by

22

merely showing the child derives some measure of benefit from maintaining parental contact." (*In re C.F., supra,* 193 Cal.App.4th 549, 558-559.)

Mother did not show that her relationship with Logan amounts to an extraordinary case, such as one in which an older child's enduring bond with a parent is entitled to be preserved despite the parent's shortcomings, because it would be harmful to the child to interfere with that enduring bond. (See, e.g., *In re Scott B.* (2010) 188 Cal.App.4th 452, 471.) Mother did not bring forward evidence to show that her relationship with Logan would promote his well-being to such a degree " 'as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re J.C., supra*, 226 Cal.App.4th at pp. 528-529.) The court performed the appropriate balancing analysis, and substantial evidence supports its finding that the second prong of the beneficial parent-child relationship exception was not met. (§ 366.26, subd. (c)(1)(B)(i).)

## DISPOSITION

The judgment and order are affirmed as to both Appellants.

---

HUFFMAN, J.

WE CONCUR:

---

BENKE, Acting P. J.

---

O'ROURKE, J.

23